***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as a matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties stipulated as Stipulated Exhibit 1 a Pre-Trial Agreement which contained the following stipulations:
a. The employee is Simon W. Sanders.
b. The employer is Corning, Inc.
 c. The carrier on the risk at the time of the alleged injury by accident was Kemper National Insurance Company.
 d. The employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and employee at all relevant times for this claim.
e. Plaintiff's average weekly wage is $532.00.
 f. Plaintiff's claim is for a psychological condition allegedly arising out of and in the course of his employment. Defendants have denied plaintiff's claim as compensable.
g. Plaintiff last worked for defendant-employer on 20 February 1998.
h. Plaintiff has not returned to work for defendant-employer.
 i. Plaintiff contends that he should be paid temporary total disability benefits during the period of his disability, provided vocational services to assist in his return to his past work or some alternative work, and medical benefits, and other benefits as determined to be appropriate in the future.
2. The parties' Pre-Trial Agreement contained multiple documents marked as Stipulated Exhibit 1.
3. The parties stipulated into evidence as Stipulated Exhibit 2 Plaintiff's Answers to Pre-Hearing Interrogatories.
4. The parties stipulated into evidence the depositions of Bob Pierce, Felix Forbes, Johnny Wilson, Dr. John Parkinson, and Dr. Robert Weinstein, which were all taken before the hearing before the Deputy Commissioner.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 48 years old at the time of the hearing before the Deputy Commissioner. Plaintiff began working for defendant-employer in 1981 as an acid room operator. In July 1983, plaintiff was asked to enter a "bag house" area to perform certain tasks. The temperature in the bag house was in excess of 140 degrees, and the air contained a gaseous hydrochloric acid. While in the bag house, plaintiff wore an enclosed suit with air supplied by hoses. During the course of performing his work in the bag house, plaintiff's air supply was cut off several times. In the days following the bag house incident, plaintiff began to experience what was later diagnosed as a severe panic disorder.
2. Plaintiff began receiving treatment from psychiatrist Dr. John Parkinson in May 1984, whose treatment of plaintiff has continued since that time. Dr. Parkinson primarily treated plaintiff through counseling, medication and medical monitoring. Plaintiff's panic attacks had been limited to six to eight attacks per year under Dr. Parkinson's treatment, and at no time during his employment with defendant-employer prior to 20 February 1998 did plaintiff miss seven or more consecutive days of employment due to his panic attacks.
3. Dr. Parkinson opined that plaintiff's job duties as an acid room operator caused or significantly contributed to the development of his panic attacks, and that plaintiff's employment which required him to work in a full body suit and which subjected him to loss of air without notice placed plaintiff at an increased risk for developing an anxiety disorder than that of the general public not so exposed.
4. Although plaintiff suffered from a panic disorder which required continuing treatment, plaintiff's condition did not become disabling prior to 20 February 1998 as it did not diminish his wage earning capacity. Plaintiff worked continuously with defendant-employer from 1983 until 20 February 1998. Plaintiff maintained a high level of performance and received promotions and corresponding raises in salary during said time. Plaintiff's supervisor was familiar with plaintiff's job-related panic disorder, and accommodated plaintiff's needs regarding absences and other allowances for his pre-existing condition.
5. In 1996, defendant-employer created a new position entitled Night Shift Trades Supervisor (TSS). Plaintiff interviewed for the position with Robert Pierce, Department Manager of Maintenance, and Len Barber. The TSS job was outlined to plaintiff as consisting of the following: 80% of his time would be spent reviewing and rewriting preventive maintenance procedures (PM project) for the plant which would take approximately one year to complete, and 20% of his time would be spent monitoring his radio to handle any problems that arose with six trades people working under plaintiff. In addition, plaintiff was supposed to monitor facility alarms in the plant. Plaintiff was not required to personally respond to those alarms, but was instructed to advise Johnny Wilson, the day supervisor who was in charge of defendant-employer's facility maintenance. It was envisioned that plaintiff would ultimately become sufficiently familiar with the maintenance facilities to eliminate the necessity of Mr. Wilson having to return to the plant at night to handle emergencies.
6. In February 1997, plaintiff was promoted to the TSS position. Plaintiff underwent training for approximately five weeks under his immediate supervisor, Felix Forbes. Mr. Forbes was not at plaintiff's interview with Mr. Pierce, and had not received any instruction from Mr. Pierce regarding plaintiff's duties. When plaintiff completed his training and assumed the TSS duties, he found that in addition to the duties described in his interview, he was also required by Mr. Forbes to perform administrative duties which included the administration of payroll, scheduling of vacation requests, disciplinary actions, supervision and personnel review of trades people, inventory of critical spare parts, an annual review of trades people, conflict resolution between trades and production personnel, and occasional procurement of a weekly preventive maintenance schedule.
7. At approximately the same time that plaintiff was promoted, the plant began an expansion to include new technology equipment designated "Tower 5." During the course of several months as Tower 5 came on line, plaintiff was required to monitor the radio continuously and to respond to calls, verify information and intervene in disputes. Because of the new technology, the problems encountered by the trades people working on the project greatly increased, and plaintiff was called upon regularly to assist them.
8. As early as June 1997, Mr. Pierce began to notice that plaintiff was not making satisfactory progress on the PM project. He questioned Mr. Forbes, who told him that plaintiff's absences had increased. Mr. Forbes did not mention plaintiff's pre-existing job-related panic disorder.
9. In August 1997, plaintiff reported to Dr. Parkinson that his new job required him to report to two different supervisors who each had different ideas about his primary duties, and that the new management was less accommodating in regards to his mental condition.
10. After plaintiff had held the TSS position for approximately eight months, Mr. Pierce, still unsatisfied with plaintiff's progress on the PM project, asked Mr. Forbes for a six month review of plaintiff's work. The review by Mr. Forbes focused on plaintiff's increased absences, which were determined to be unreasonable and unacceptable. Plaintiff met with Mr. Pierce, and informed him of his panic disorder and stress problems stemming from the bag house incident. Plaintiff explained that the conflicting expectations between Mr. Pierce and Mr. Forbes over what his job duties were made it difficult for him to complete the workload assigned to him by both supervisors, and that as a result he was suffering an increase in panic attacks, which in turn led to an increase in stress-related absences from work.
11. On 6 January 1998, plaintiff met with Mr. Pierce to discuss possible remedies to plaintiff's continuing absenteeism. Mr. Pierce arranged for plaintiff to see the company physician, Dr. Harold Imbus. Plaintiff presented to Dr. Imbus and explained his situation, including his treatment since the bag house incident and the current difficulties he faced in trying to perform up to the expectations of both Mr. Forbes and Mr. Pierce. Thereafter, Dr. Imbus met with Mr. Pierce and the TSS administrative duties were removed from plaintiff's workload.
12. Plaintiff began to make progress on the PM project, but continued to have difficulty controlling his anxiety and panic disorder. On 20 February 1998, Dr. Parkinson recommended that plaintiff take a medical leave of absence, believing that plaintiff's symptoms were severe enough that he should not be in the work environment.
13. Shortly after plaintiff's medical leave began, defendant-employer assigned Jack Flack, a senior electrician, to spend nine hours a day, five days a week, on the PM project. Mr. Flack was given no other duties. During the following four months, Mr. Flack was only able to complete the electronic portion of the project, despite having none of the other duties plaintiff was required to perform.
14. Dr. Parkinson treated plaintiff with various medications through January 2000, but plaintiff's condition did not improve significantly and he suffered side effects from the medication, including mental dulling, memory loss, decreased sexual function, depression, and tremors or shakiness of the hands and extremities. By 2000, Dr. Parkinson opined that plaintiff's condition "was much worse, both from the fact that he had some persistent and recurrent panic problems, but the fact that the depression became such an issue."
15. Other than during a six month period from November 1998 until May 1999 when plaintiff's symptoms improved, Dr. Parkinson stated that plaintiff's condition significantly impaired his ability to attend to tasks and concentrate on details in a work setting, and to sustain reliability in a work place over an eight hour day for five days a week.
16. Dr. Parkinson opined and the Full Commission finds that the significant increase in plaintiff's work load coupled with the job demands of two supervisors without making accommodations for his pre-existing condition provided the stimulus which tilted plaintiff's condition from non-disabling to disabling.
17. In August 1999, plaintiff presented to psychiatrist Dr. Robert Weinstein for a second opinion evaluation. On 28 March 2000, plaintiff began treatment with Dr. Weinstein, whose treatment of plaintiff continues. Based upon the history of plaintiff's condition, his treatment and his work experiences, Dr. Weinstein was of the opinion and the Full Commission finds that plaintiff's job duties as an acid room operator caused his anxiety and panic disorder which has persisted and which has only been partially responsive to treatment. While plaintiff was able to work with accommodations, he never reached maximum medical improvement from his anxiety and panic disorder. Dr. Weinstein further opined and the Full Commission finds that plaintiff's new job stressors aggravated his pre-existing anxiety disorder and that both plaintiff's job as an acid room operator and the job duties he was assigned as a TSS placed him at a greater risk of aggravating his condition of anxiety disorder over that of the general public.
18. Referring to the acid room operator position, Dr. Weinstein opined that "an acutely unplanned, life-threatening episode" can create or aggravate a panic disorder. Plaintiff's job as an acid room operator took place in an enclosed area, required wearing a claustrophobic space suit, and involved repeated interruptions of his air supply. Dr. Weinstein labeled plaintiff's position as "a provocative situation."
19. Upon consideration of the TSS position, Dr. Weinstein noted that whenever a dedicated, responsible person is placed in a position where they are generally alone in performing a job which is more than they can accomplish, that person will try and do it all, fail, then feel overwhelmed. If that person already has an anxiety disorder, such work conditions would cause the anxiety "to cascade."
20. Dr. Weinstein opined that when he saw plaintiff on 19 July 1999, plaintiff was disabled in that he had lost his capacity to work. When he began treatment of plaintiff in 2000, plaintiff's condition had not improved and he remains disabled. Dr. Weinstein's prognosis for plaintiff's eventual recovery depends upon the success they have with medication. He stated that plaintiff's condition will be life-long, but with proper medication he may be able to achieve some level of recovery.
21. Plaintiff suffers from an anxiety disorder which flowed directly from and is causally related to a work-related injury by accident which occurred when plaintiff was employed by defendant-employer as an acid room operator, but was non-disabling until 1997 when plaintiff's work load increased so substantially that he was unable to handle all of the duties assigned. Plaintiff's overwhelming work load caused high levels of stress and anxiety which significantly aggravated his pre-existing, work-related, non-disabling anxiety disorder causing him to miss more days from work due to increased panic attacks and to subsequently become unable to work.
22. Plaintiff is currently totally disabled as defined under the Workers' Compensation Act. Based upon the evidence presented, plaintiff has attempted unsuccessfully to return to work designing koi ponds and as a carpenter's helper. These attempts at employment are not indicative of plaintiff's ability to earn wages in the competitive job market.
23. Plaintiff's stipulated average weekly wage of $532.00 yields a weekly compensation rate of $354.68.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. As a direct result of plaintiff's work duties as a bag house operator and an incident where his air supply was cut off several times in July 1983, plaintiff developed an anxiety disorder. Plaintiff's position as a bag house operator placed him at an increased risk of developing an anxiety disorder over that of the general public. Although not disabling, the anxiety disorder which plaintiff developed as a result of the bag house incident required continuous medical treatment as well as workplace accommodations and he has not reached maximum medical improvement. The work "overload" placed upon plaintiff due to his change in position and the overburdening job assignments from two supervisors who both assigned plaintiff full time duties significantly aggravated plaintiff's pre-existing panic disorder and resulted in plaintiff incapacity to work. Plaintiff's current disabling anxiety disorder which is a direct result of his job duties constitutes a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Because plaintiff's work-related anxiety disorder of July 1983 was not disabling and although plaintiff missed some time from work periodically for treatment or otherwise, plaintiff sustained no loss in earning capacity until he became totally disabled on 20 February 1998. The time for filing a claim for an occupational disease pursuant to N.C. Gen. Stat. § 97-58 did not begin to run until that time. N.C. Gen. Stat. § 97-2(9); Howard v. Square-D Co., 128 N.C. App. 303,494 S.E.2d 606, dis. review improv. allowed, 349 N.C. 224, 494 S.E.2d 606
(1998).
3. As a result of job duties assigned to him after February 1997, plaintiff's non-disabling, work-related anxiety disorder was significantly aggravated by conditions peculiar to his employment, causing his anxiety disorder to become totally disabling as of 20 February 1998. N.C. Gen. Stat. § 97-58.
4. "Disability [i.e., incapacity for work, see N.C.G.S. § 97-2(9)] caused by and resulting from a disease is compensable when, and only when, the disease is an occupational disease, or is aggravated or accelerated by causes and conditions characteristic of and peculiar to claimant's employment." Walston v. Burlington Industries, 304 N.C. 670,285 S.E.2d 822, as amended, 305 N.C. 296, 297, 285 S.E.2d 822, 828
(1982).
5. In the instant case, plaintiff has shown by the greater weight of the evidence that he had a pre-existing, work-related, non-disabling anxiety disorder, which resulted from causes and conditions characteristic of and peculiar to his employment as an acid room operator and which placed him at an increased risk over that of the general public not so employed of developing such a disorder. Plaintiff's anxiety disorder constituted an occupational disease from which he never fully recovered. Defendants were aware of plaintiff's condition, and following the development of the disorder, made allowances and accommodations for plaintiff's condition. N.C. Gen. Stat. § 97-53(13).
6. The drastic increase in the volume, variability and demands of plaintiff's job duties as a Night Shift Trade Supervisor (TSS) significantly contributed to the material aggravation of his work-related, non-disabling anxiety disorder and placed him at an increased risk over that of the general public not so employed of significantly aggravating his pre-existing anxiety disorder. Absent the conditions of plaintiff's employment as Night Shift Trades Supervisor for defendant-employer, his condition would not have accelerated on its own to become disabling. Plaintiff successfully performed his duties for defendant-employer for approximately 15 years while he suffered from an anxiety disorder. It was not until plaintiff was placed in a position where his work load substantially increased to an overwhelming level that his pre-existing condition progressed to a point where he became totally disabled. The unreasonablness of defendant-employer's job demands and expectations of plaintiff were further illustrated by the fact that in 4 months plaintiff's replacement was able to complete only a small portion of plaintiff's assigned tasks on the PM Project, even though he had none of plaintiff's other duties to perform. Id.
7. Both of plaintiff's physicians were of the opinion that plaintiff's job duties, both as an acid room operator and as a TSS, directly caused or aggravated his anxiety disorder and ultimately caused him to be totally disabled, and that his job situations placed him at an increased risk over the general public of developing and/or aggravating his anxiety disorder. Accordingly, plaintiff is eligible for compensation for an occupational disease under the Act. Id.; N.C. Gen. Stat. § 97-53(13).
8. With the exception of those periods during which plaintiff earned some wages during his return to work efforts, plaintiff is entitled to indemnity compensation in the weekly amount of $354.68 to be paid by defendants beginning on 20 February 1998 and continuing until plaintiff returns to work at his pre-injury wage or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
9. For the periods of time during which plaintiff attempted to work and earned some wages as a koi pond designer, a carpenter's helper, or other occupation, plaintiff is eligible for payment of temporary partial disability compensation by defendants of two thirds of the difference between his pre-injury wage and the wages he earned during those periods. N.C. Gen. Stat. § 97-30.
10. Plaintiff is entitled to have defendants pay for all medical treatment related to his compensable occupational disease so long as such treatment is reasonably designed to effect a cure or to give relief from plaintiff's disability. N.C. Gen. Stat. § 97-25.
11. Based upon the opinion of Dr. Weinstein that plaintiff will require medication and psychotherapy for the remainder of his life and that his level of recovery will fluctuate but plaintiff will never fully recover, the Full Commission concludes that plaintiff has not reached maximum medical improvement.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to Paragraph 2 of this Award and to attorneys fees approved below, defendants shall pay plaintiff weekly indemnity compensation for total disability in the amount of $354.68 beginning on 20 February 1998 and continuing until further order of the Commission. The amount accrued shall be paid to plaintiff in a lump sum.
2. For those periods of time during which plaintiff unsuccessfully attempted to work in some capacity, defendants shall pay to plaintiff two thirds of the difference between his pre-injury wages and the wages he earned in his work attempts. Said compensation shall be paid in a lump sum.
3. Defendants shall pay for all medical expenses, incurred or to be incurred in the future, related to plaintiff's compensable occupational disease.
4. An attorney's fee of 25% of the compensation awarded to plaintiff in Paragraphs 1 and 2 above is hereby approved for plaintiff's counsel. One fourth of the lump sums due plaintiff shall be paid directly to plaintiff's counsel. Thereafter, every fourth payment of compensation shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs of this action.
This the ___ day of January, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER